UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .   CR No. 21-0317-02 (TSC)
                                   .
     v.                            .
                                   .
CHRISTIAN CORTEZ,                  .   Washington, D.C.
                                   .   Wednesday, August 31, 2022
          Defendant.              .   12:40 p.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          KATHRYN E. FIFIELD, AUSA
                             TROY A. EDWARDS, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530
                             (202) 252-7566


For Defendant:               AMR A. AHMED, AFPD
                             Federal Public Defender Office
                             440 Louisiana Street
                             Suite 1350
                             Houston, TX 77002
                             (713) 718-4600


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have criminal action 21-317-2, United States of America versus Christian Cortez. We have Ms. Kathryn Fifield and Mr. Troy Edwards, Jr., representing the government.  We have Mr. Amr Ahmed representing Mr. Cortez, all appearing in person.  We also have Ms. Ami Landon representing Probation and she's here as well in person.

THE COURT:  All right.  To counsel and the parties at counsel table, including Mr. Cortez, if you -- you have an option.  You can stay at counsel table and speak into the microphone if it's more comfortable, or you can approach the lectern and speak at the lectern.  While you are speaking, you are free to take your mask off, while you're speaking. So it's up to you.  Mr. Cortez, good afternoon.

THE DEFENDANT:  Good afternoon.

THE COURT:  All right.  I may ask a couple questions of you, but again, if I do, you can answer the questions seated at counsel table; just make sure you speak into the microphone and that the microphone is on.  But you may be seated for this portion.

We're here for the sentencing of Mr. Christian Cortez who has pleaded guilty to a superseding information charging him with obstructing, impeding or interfering with law enforcement officers during a civil disorder in violation of 18 U.S.C.

§ 231(a)(3).

Before we start, just to let you know, at about noon I received an email from defense counsel with three questions which I want to put on the record and address.

First, defense counsel alerted me to the fact that one of defense's exhibits, a U.S. Capitol Police timeline of events on January 6, is a sensitive document that it believes should be sealed.  Defense counsel informed me that he called the clerk's office and that the clerk's office has since locked public access to it, and defense counsel would like the document to remain sealed.

Does the government have any objection?  Ms. Fifield, will you be speaking for the government today?

MS. FIFIELD:  Yes, Your Honor.  The government has no objection.  In fact, the government and defense counsel conferred and contacted the clerk's office together.

THE COURT:  Okay.  Thank you.  I will confess that I'm not sure why this document was given to me.  I looked at it, I considered it, but I'm not quite sure the purpose of the defense submitting that document to me.

But just a reminder that if there are documents that contain medical information or other information that is subject to seal, the proper method is to file a motion to seal before submitting the document.  But it seems as if the inclusion of that document or the failure to file a

1    motion to seal was inadvertent, so I assume that document

2    will remain locked and I will allow it to remain under seal.

3        Second -- so I'll grant the oral motion to seal.  Second,

4    defense counsel asked if he could play videos submitted as

5    defense exhibits during the sentencing.  Does the government

6    have any objection?  Ms. Fifield?

7        MS. FIFIELD:  No.  The government has no objection.

8    The government sent an email to chambers similarly requesting

9    permission to play video exhibits.

10       THE COURT:  All right.  So with regard to the defense

11   request, there being no objection, I will allow those exhibits

12   to be played.  Mr. Ahmed, do you have any objection to the

13   government's playing the video exhibits at the sentencing?

14       MR. AHMED:  No, Your Honor.

15       THE COURT:  Then I will grant both requests to have

16   those video exhibits played at the sentencing.

17       Third, defense counsel has requested that Mr. Cortez's

18   mother, Ms. Angela McClanahan -- are you here, ma'am?  Good

19   afternoon.  Thanks for coming -- be allowed to speak on

20   Mr. Cortez's character and medical issues.  And the government

21   does not object to this.  Is that correct, Ms. Fifield?

22       MS. FIFIELD:  That is correct, Your Honor.

23       THE COURT:  I will allow Ms. McClanahan to speak later

24   during the allocution.  Obviously, whatever remarks she has to

25   make should be reasonably brief.  Also, if she's going to talk

1    about Mr. Cortez's medical condition, I'm wondering,

2    Mr. Ahmed, do you want that to be under seal or is she just

3    going to speak generally about it?  It's up to you, it's your

4    client.

5         MR. AHMED:  I don't believe we need to have that under

6    seal.

7         THE COURT:  All right.  That's up to you.  I noticed

8    you had submitted medical information and you did not request

9    that that material be sealed.  So okay.  That's fine.  All

10   right.  So we can begin properly.

11      In preparation for this sentencing I have received and

12   reviewed the presentence report and the sentencing

13   recommendation from the probation office, and I've also

14   received and reviewed the following documents submitted by

15   counsel:

16      The plea agreement and statement of offense that were

17   signed by Mr. Cortez; sentencing memoranda from the government

18   including -- or a sentencing memorandum from the government

19   including two video exhibits; sentencing memorandum from

20   Mr. Cortez along with Mr. Cortez's sentencing memorandum

21   exhibits, which include a personal statement from Mr. Cortez,

22   CCTV and public videos and still images captured from CCTV

23   videos on January 6; the document that I described, the

24   timeline of events, which have now been -- that has now been

25   placed under seal; letters from three of Mr. Cortez's

1       neighbors, his godmother, and his mother; as well as

2       Mr. Cortez's medical records.

3           All right.  So that's the entirety of what I have received

4       and reviewed.  Am I missing anything counsel, Ms. Fifield?

5               MS. FIFIELD:  Nothing from the government.

6               THE COURT:  Mr. Ahmed?

7               MR. AHMED:  No, Your Honor.

8               THE COURT:  So let me begin first with the presentence

9       report.  The final presentence report and sentencing

10      recommendation were filed on August 23, 2022.  Ms. Fifield,

11      does the government have any objection to any of the factual

12      determinations set forth in the presentence report?

13              MS. FIFIELD:  The government has no objection.

14              THE COURT:  Are you expecting an evidentiary hearing

15      today?  Do you have any witnesses present?

16              MS. FIFIELD:  The government has called a Metropolitan

17      Police Department officer to submit a victim impact statement.

18      The government as evidence intends to present those video

19      exhibits and nothing further.

20              THE COURT:  Is the officer in the courtroom?

21              MS. FIFIELD:  The officer is here, yes.

22              THE COURT:  Good afternoon, sir.  Thank you for coming.

23          Mr. Cortez, are you fully satisfied with the services of

24      your lawyer, Mr. Ahmed?

25              THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  Do you feel that you've had

2     enough time to talk with your lawyer about the probation

3     department's presentence report and the papers that were

4     filed by the government in connection with the sentencing?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.

7       Mr. Ahmed, have you and Mr. Cortez read and discussed

8     the presentence report?

9          MR. AHMED:  Yes, Your Honor.

10          THE COURT:  Are there any disputed issues of fact?

11     That is, does Mr. Cortez have any objection to any of the

12     factual statements set forth in the presentence report?

13          MR. AHMED:  No, Your Honor.

14          THE COURT:  All right.  Hearing no objection from

15     either side, I will accept the factual recitation in the

16     presentence report regarding the circumstances of the offense

17     and therefore the facts as stated in the presentence report

18     will be my findings of fact for the purpose of this

19     sentencing.

20       So the presentence report lays out the guidelines --

21     lays out the probation office's calculation of the advisory

22     guideline range that applies in this case.  The calculation

23     was done using the 2021 guidelines manual and is as follows:

24       The guideline for a violation of 18 U.S.C. § 231(a)(3) is

25     found in U.S. Sentencing Guidelines §2X5.1.  That section

provides that if the offense is a felony for which no
guideline expressly has been promulgated, then the Court
applies the most analogous offense guideline.

In this case, the most analogous offense guideline is
Sentencing Guideline §2A2.4, which is the offense guideline
for obstruction or impeding officers.  Pursuant to §2X5.1(a)
and §2A2.4, the base offense level is 10.

Mr. Cortez has demonstrated acceptance of responsibility
for the offense.  Accordingly the offense level is decreased
by two levels under §3E1.1(a).  This results in a total
offense level of 8.

Turning to the applicable criminal history category, the
presentence investigation report has found that Mr. Cortez has
zero prior convictions that receive criminal history points in
the guidelines manual, giving him a criminal history point
subtotal of zero, which puts Mr. Cortez in criminal history
category I.

Based on the offense level and criminal history category --
well, let me ask you, Ms. Fifield, does the government have
any objection to that calculation of the criminal history
category or the offense level?

MS. FIFIELD:  No.

THE COURT:  Mr. Ahmed?

MR. AHMED:  No, Your Honor.

THE COURT:  All right.  Based on the offense level and

1    criminal history category I've just discussed, the presentence

2    report calculates the guidelines sentencing range to be zero

3    to six months of imprisonment.

4        Having determined the applicable guidelines range, the next

5    step is for me to consider departures and variances.   The

6    presentence report does not include any departure grounds and

7    the parties I believe pursuant to the plea agreement do not

8    make any arguments regarding a departure or variance.

9        Is that correct, Ms. Fifield?

10           MS. FIFIELD:  That is correct, Your Honor.

11           THE COURT:  Mr. Ahmed?

12           MR. AHMED:  Yes, Your Honor.

13           THE COURT:  Okay.  Now, with regard to the statutory

14   framework under which we're operating, § 3553 requires me to

15   consider a variety of factors including the sentencing range

16   that the guidelines prescribe, which I've just discussed, but

17   also the applicable penal statutes.

18       The charge of civil disorder in violation of 18 U.S.C.

19   § 231(a)(3) is a Class D felony that carries a maximum term

20   of five years of imprisonment.  The statutes provide that

21   Mr. Cortez faces a supervised release range following

22   imprisonment of not more than three years under 18 U.S.C.

23   § 3583(b)(2), and under the guidelines the supervised release

24   range is one to three years.

25       The statute provides that Mr. Cortez is eligible for one

to five years of probation under 18 U.S.C. § 3561(c)(1).
The guidelines also provide that any term of probation shall
be at least one year but not more than five years, and that's
sentencing guideline 5B1.2(a)(1).

The statute sets a maximum fine of up to $250,000.  The
guidelines range for this offense is from $2,000 to $20,000.
And a special assessment of $100 per felony count, which would
be $100 in this case, is mandatory.  Pursuant to the parties'
plea agreement, restitution in the amount of $2,000 shall be
ordered.

Counsel, have I accurately stated the statutory and
guidelines framework here, Ms. Fifield?

                MS. FIFIELD:  Yes, Your Honor.

                THE COURT:  Mr. Ahmed.

                MR. AHMED:  Yes, Your Honor.

                THE COURT:  All right.  Before I discuss the other
sentencing factors that will bear on my final decision -- the
parties may already have this because I routinely allow them
to have it, but for the record I'll notify them of the
sentence that the probation office has recommended.  Taking
into account the guidelines range and the 3553(a) factors,
probation office recommends 30 days of imprisonment, 12 months
supervised release, $2,000 fine and $2,000 restitution.

The recommendation of the probation office is not based on
any facts or circumstances that have not already been revealed

1    to the parties in the presentence report.

2        All right.  At this point I'd like to give the parties

3    an opportunity to address the Court.  Ms. Fifield?

4            MS. FIFIELD:  Good afternoon, Your Honor.

5            THE COURT:  Good afternoon.

6            MS. FIFIELD:  Just a handful of preliminary matters

7    before I get into the substance of the allocution.  First I'd

8    like to introduce also at counsel table with myself and

9    Mr. Edwards is a paralegal from the U.S. Attorney's Office,

10   Matthew Leech, who has been kind enough to join us today to

11   facilitate the playing of both government and defense video

12   exhibits.

13           THE COURT:  Good afternoon.  Thank you.

14           MS. FIFIELD:  Secondly, as to the preliminary

15   matters that you discussed at the beginning of the hearing,

16   I do want to credit defense counsel, who did approach the

17   government about a motion to seal prior to the sentencing,

18   and the communication that I gave to him was the preference

19   would be to file them -- file the exhibits publicly and to

20   let me know if any of the documents needed to remain under

21   seal.

22       We conferred about the publication of CCTV which requires

23   approval, but I missed Exhibit 4.  So that was on me and

24   defense counsel did take steps to have the exhibits filed

25   under seal.  So I did want to acknowledge that.

1          THE COURT:  I appreciate the mea culpa, Ms. Fifield.

2     And thank you, Mr. Ahmed, for alerting her to that.  Everybody

3     has acted professionally.

4          MS. FIFIELD:  Thank you, Your Honor.

5       And as the Court has already addressed, the government

6     will be recognizing an officer, Officer Toby Green, from the

7     Metropolitan Police Department, for a victim impact statement

8     as part of the allocution.  With the Court's permission I

9     would like to go over a high level overview of the defendant's

10    offense conduct first, play the government's video exhibit,

11    and then call the officer if that's all right.

12         THE COURT:  That's fine.

13         MS. FIFIELD:  So we're here today on sentencing for

14    Christian Cortez.  Mr. Cortez had a codefendant, Benjamin

15    Larocca, who was here before this court about three weeks

16    ago to discuss Mr. Larocca's offense.  And Mr. Larocca was

17    sentenced by this court on August 10.

18      I discussed in some detail the two defendants' offense

19    conduct at that hearing.  With respect to -- with the

20    exception of what I imagine will be the focus of today's

21    factual discussion, which is the altercation that Mr. Cortez

22    had outside the north doors of the Capitol, Mr. Larocca and

23    Mr. Cortez acted in lockstep.

24      So I will briefly summarize the offense conduct leading

25    up to this confrontation outside the north doors, but I am

1    not going to get into any great detail, and if the Court

2    would like to review the exhibits that the government

3    submitted in connection with the Larocca sentencing, the

4    government would refer the Court to that record.

5          THE COURT:  I recall them.  I did review them.

6    Thank you.

7          MS. FIFIELD:  Thanks very much.

8       Mr. Cortez and Mr. Larocca, beginning on January 4, drove

9    from their home where they were roommates in Seabrook, Texas,

10   to Washington, D.C.  They went to Capitol grounds and they

11   arrived on Capitol grounds at what I have described as the

12   zenith of the riot.  And what I mean by that is many of the

13   major breaches had already occurred, and while prior to their

14   arrival I would describe the riot as escalating, I would say

15   at the time of their arrival the riot was exhibiting kind of

16   the peak of its escalation.

17      And by that I mean on the Lower West Terrace, there was

18   what has been described by some of my colleagues as a medieval

19   battle between law enforcement and rioters, hand-to-hand

20   combat.  Would have been very loud.  There would have been

21   crowd control ordnance being deployed.

22      Mr. Larocca and Mr. Cortez, in their path to get up to the

23   Capitol building, would have come in very close proximity to

24   that melee.  And while we have no direct evidence that they

25   saw or heard that violence being committed, it seems

1    impossible to imagine that they did not.

2        They were on the West Lawn prior to their approach to the

3    Capitol building, where Mr. Cortez took a selfie showing

4    rioters scaling the walls of the Capitol in the background and

5    using bike rack barriers that had previously been demarcating

6    the restricted areas in the Capitol grounds as a ladder to

7    help them get up the Capitol building.

8        And his expression in that selfie, it's not quite the same

9    energy as we'll see from Mr. Cortez later, but it is certainly

10   not reflecting a concern for the chaos that's happening around

11   him at that time.

12       Mr. Cortez and Mr. Larocca approached the Parliamentarian

13   Door, which is on the Senate side of the Capitol building,

14   on the west side of that Senate Wing.  They proceeded into the

15   Brumidi Corridors, which were an ornate set of corridors.  And

16   for anyone who's been inside the Capitol building, they know

17   that the space between the Senate Wing door and where

18   Mr. Larocca and Mr. Cortez ultimately end up, the north doors,

19   is pretty short.

20       And that's been important in a number of these cases for

21   a number of reasons.  It means that these rioters who came in

22   on the west side, on the Senate side, were in extremely close

23   proximity to members of Congress as they were evacuating, and

24   they were in extremely close proximity to Capitol Police who

25   were inside the building at various times trying to facilitate

1    those evacuations and trying to impede rioters' progress

2    through the Capitol building.

3        And that is what Capitol Police did to Mr. Larocca and

4    Mr. Cortez; they impeded their progress.  And nevertheless

5    Mr. Larocca and Mr. Cortez, as was discussed at Mr. Larocca's

6    sentencing, faced off with these officers in those hallways

7    and were chanting.  And again, for anyone who's been inside

8    the Capitol building, all that marble really, really pushes

9    the sound back down on you and you can feel it.

10       And we know, and I talked about this at the Larocca

11   sentencing, those officers could feel it.  And one of the

12   things that I emphasized as part of that sentencing was the

13   extreme and commendable restraint exercised by officers that

14   day under those circumstances.  And that's something that

15   we'll talk about more today as well.

16       Which leads us to their exit.  They exited the building

17   at the direction of police.  According to Mr. Larocca it was

18   under the threat of arrest if they did not leave.  And they

19   ended up outside the north doors, which by piecing together

20   the videos that we have, we know that they exited the building

21   at about 3:06 p.m., and the rest of what we know about what

22   happened outside the north doors comes from open-source video,

23   and we can only do time estimates with those because they

24   don't come with the handy time stamps that Capitol CCTV does.

25       So by all accounts, in our estimate, Mr. Larocca and

1    Mr. Cortez were outside those north doors for about 15 to

2    20 minutes.  And as discussed at the Larocca sentencing,

3    Mr. Larocca remained in that area despite the chaos and

4    the mayhem.  And the main difference between the conduct

5    of Mr. Cortez's codefendant, Mr. Larocca, and Mr. Cortez are

6    the choices that Mr. Cortez made in those 15 to 20 minutes

7    outside the north doors.

8         So at this point I'd like to have Mr. Leech pull up

9    Exhibit 8.  The government also submitted another video

10   exhibit, Exhibit 9.  The government is only going to play from

11   Exhibit 8 today.  Exhibit 9 was marked as I believe Exhibit 5

12   in the Larocca sentencing, so the Court has already seen it.

13        THE COURT:  I have.

14        MS. FIFIELD:  We're going to start at 10 minutes and

15   30 seconds into the video.

16      (Video played.)

17        MS. FIFIELD:  I'd just like to pause briefly, and

18   I'll do that a bit throughout the time that we'll play this

19   exhibit.  This is 10 minutes and 59 seconds into the video,

20   and Mr. Cortez is now in view in the frame.  He's approximately

21   in the middle of the frame, to the left of the Metropolitan

22   police officer who is at the front of this group of officers.

23        Mr. Cortez is wearing a red beanie style hat, black jacket,

24   and a, what I would describe as a soccer scarf with the name

25   of the former president on it.  He's also carrying a blue

flag.

And as we can see from the 30 seconds of the video that have already played, the officers are engaged in what looks like sort of -- they're defending the north doors of the Capitol but they're in sort of an offensive posture, trying to keep these rioters back and away from the north door which is behind them and outside the frame.

(Video continues.)

MS. FIFIELD:  I paused at 12:06 into the video and what we saw was a -- I would call it a coordinated advance toward the north doors led in part by Mr. Cortez.

(Video continues.)

MS. FIFIELD:  Pausing again at 12:56, to point out Mr. Cortez inside the vestibule of the north doors.  You can still see that red beanie that he's wearing.

(Video continues.)

MS. FIFIELD:  Paused at 13:28 into the video, and we just heard Mr. Cortez shout "Hold our positions" before moving back into the vestibule.  He'd been pushed out with other rioters by what I believe was fire extinguisher retardant, was being sprayed by the officers on the inside.  But now he's going back into the vestibule and saying "hold our positions" while he does that.

(Video continues.)

MS. FIFIELD:  I'm going to pause briefly here at 15:09.

1   There are rioters throwing what sound like fairly heavy

2   projectiles towards the doors.  And while that's happening you

3   can see that red beanie of -- Mr. Cortez's red beanie in the

4   background about three feet away from this rioter throwing the

5   projectiles.

6       (Video continues.)

7       MS. FIFIELD:  Paused here at 15:55.  I just wanted

8   to first note for the Court that I may have mistaken --

9   there's a second individual of similar stature wearing a red

10  beanie.  I believe that was that second individual that I

11  identified in my last pause.

12      But here what we've just seen is while fire extinguisher

13  retardant is pouring out of the vestibule, rioters have picked

14  up a bike rack barricade and are using it as a battering ram

15  to get back into the doors.

16      (Video continues.)

17      MS. FIFIELD:  Pause briefly here at 18:32.  For the

18  last minute or so, we have been able to see Mr. Cortez in

19  the vicinity of the doors wearing his red beanie, which is

20  recognizable by what looks like the signature of the former

21  president on the back of the beanie, and the rioters around

22  him are yelling "let us in" as a Capitol police officer tries

23  to negotiate into calming the crowd down.

24      (Video continues.)

25      MS. FIFIELD:  And I've stopped the video at 20:37.

1    That will conclude the government's presentation of Exhibit 8.

2              THE COURT:  Thank you, Ms. Fifield.

3              MS. FIFIELD:  Generally speaking I try to avoid playing

4    video exhibits of that length in the courtroom, but I did

5    that, or I made that choice to do that for a couple of

6    reasons.

7         Number one, as I talked about throughout those 10 minutes,

8    a number of things happened in Mr. Cortez's general vicinity

9    such as the throwing of the projectiles that happened earlier

10   in the clip that I played, as well as in the middle where it

11   was not clear that Mr. Cortez was standing in what was visible

12   inside the frame, but he was certainly in the vicinity of

13   folks picking up bike rack barriers.  That happened at various

14   points throughout that clip, throwing the projectiles, and

15   generally speaking of agitating police.

16        We also saw him playing a leadership role in that advance

17   that was at the beginning of the clip, and then ultimately his

18   conduct towards the end of the clip which was what I've called

19   a screaming match, because that's what it looks like to me.

20        And the other reason that I chose to do that is the tension

21   that I feel in a courtroom when I'm playing an exhibit of that

22   length and with that amount of cacophony, and I especially

23   apologize to the folks who are listening on the public line,

24   because that's hard to listen to.

25        But the tension that we feel here is a fraction of what it

1    was like for those officers to experience that, and perhaps

2    even the rioters themselves.  But not having been there

3    myself, I would like to ask an officer who we've asked to

4    join us today, Officer Toby Green, who was in that area at

5    that time, to provide a victim impact statement to the Court.

6                THE COURT:  Thank you.

7        Officer Green, you may step up and if you could just state

8    your name for the record.  Thank you.

9                OFFICER GREEN:  Good afternoon, Your Honor.

10               THE COURT:  Good afternoon.

11               OFFICER GREEN:  My name is Officer Toby Green.  I'm

12   assigned to the First District with the Metropolitan Police

13   Department, and I've been on the department for 19 years.

14       So I actually just watched this video and I am actually

15   in that video.  I'm one of the officers with the motorcycle

16   helmets with the white and the blue front.  So, like I said,

17   I responded down there with a group of officers that ride to

18   help get these rioters out of the Capitol.

19       It was very chaotic.  I can't say that I've experienced

20   too many situations similar to this.  So it was very unusual.

21   We've dealt with projectiles being thrown at us, being hit,

22   being sprayed with some type of irritant.  We assume bear

23   spray, but it affected your breathing, it affected your

24   vision.  Flagpoles being thrown at us, hand-to-hand pushing

25   and shoving.  And it was very, very chaotic.

1        As you can see, a lot of yelling and screaming.  The

2    alarms from the doors are sounding.  And like the attorney

3    said, the -- those marble walls, it just radiates.  It's so

4    tight in there and it's just compounding.  And we were in

5    there for quite some time.  So it was a big ordeal.  It was

6    a big ordeal.  They were using bicycle racks to try to pound

7    the doors down.

8        We couldn't get to the exterior door.  It's a vestibule,

9    there's two sets of doors.  The inner doors would secure, the

10   outer doors we couldn't get secured, so we felt like we needed

11   to get both of those secured.  And the rioters there were

12   holding on to the doors, keeping them from being pulled shut,

13   putting objects in between the doors to keep them from closing

14   completely.  So we finally were able to do that after -- it

15   seemed like hours, but it was probably about 45 minutes to an

16   hour later.

17       That's really all I have to add.  Just kind of my

18   experience and what I saw and what I went through that

19   particular day.

20       THE COURT:  Officer Green, I really do appreciate you

21   taking the time to come down here and tell me and the people

22   in this courtroom what you went through that day.  You've done

23   so in a very matter of fact, just the facts, doing my job kind

24   of a way, but as Ms. Fifield said, I've watched a lot of these

25   videos, and every time I watch one -- and I watch them every

1    time -- I am struck by how frightening that whole scene must

2    have been for a relatively smaller number of officers who were

3    outnumbered, ill-equipped, and unsupported, to face down that

4    mob.

5        I find it -- my heart rate goes up, my body tenses -- just

6    watching.  Every single time.  So I can't imagine what it was

7    like for you that day.  I never will.  But I can't tell you

8    how much I as a citizen appreciate your contributions and your

9    efforts that day because were it not for those efforts, I

10   can't imagine what the outcome would have been.  I don't like

11   to think about it.  But I am grateful for your service and

12   your fellow officers' service that day, and thank you for

13   coming here.

14           OFFICER GREEN:  Yes, ma'am.  Thank you for saying so.

15           MS. FIFIELD:  Mr. Cortez is not responsible for

16   everything that happened that day, and he's not responsible

17   for every person's actions outside those north doors, but

18   he is unquestionably a critical part of this crowd that is

19   attacking law enforcement and attempting to breach these doors

20   over the course of at least 10 minutes, trying to get back in

21   after he's been told to leave.

22       And the question that I have wanted to ask Mr. Cortez since

23   the outset of this case is why.  By all accounts, everything

24   the defense counsel has presented, Mr. Cortez seems like a

25   valuable member of his community.  He seems like a nice guy.

1    And it is difficult for me to reconcile everything that

2    I've been told by defense counsel, everything that I've seen

3    in these exhibits provided to the Court by the defense.  It's

4    difficult for me to reconcile the person that Mr. Cortez

5    purports to be with the person who showed up on January 6,

6    the person who is on that grounds, on the Capitol grounds and

7    who we see in the selfies, who we see in the videos, if that

8    person is Mr. Cortez, the nice guy, I didn't see him that day.

9    And so I would like to know, why.  What for?

10    And I assume that either Mr. Ahmed or Mr. Cortez himself is

11    going to try to answer that question for you today and they

12    have tried to answer that question so far in their sentencing

13    memoranda, I think.

14    But I still feel like I don't understand.  And I think that

15    that is a reaction that I've had -- I do these Capitol riot

16    cases full time, and I have done for the last year and a half,

17    and that is the question that I have in so many of these

18    cases.  And I hear so many judges in this district talking

19    about aberrant behavior just like Mr. Ahmed did in his

20    sentencing memorandum.

21    And the "why" is an important part of sentencing, because

22    it's the key to deterrence.  It's the key to specific

23    deterrence, it's the key to general deterrence, so that the

24    nice guy, Mr. Cortez, and similarly situated individuals, do

25    not do this again.  We need to know why.  And we may never

1    get that answer.

2        So it's partially about the "why," but it's also about

3    accountability.  And regardless of what brought Mr. Cortez

4    all the way from Texas to Washington, D.C., what he did there

5    is what he's here today facing sentencing for.  Regardless of

6    why, he needs to be held accountable for the threat that he

7    posed to officers.  This is not about politics.  This is not

8    about Mr. Cortez's statements or what he believed.  It's about

9    what he did.  It's about conduct.

10       And Mr. Cortez willingly engaged in successive and

11   escalating criminal conduct on January 6, first by entering

12   the restricted grounds, then by seeing the mayhem, the

13   destruction, the chaos, and remaining in the vicinity of all

14   of that for possibly up to an hour, if not longer.  And that

15   doesn't even get to what happened outside the north doors.

16   And that, as we saw, for those 10 whole minutes, were

17   intentional choices made, made with his voice, made with his

18   body.  He was fully in that moment.

19       So the government has recommended four months of

20   incarceration, three years of supervised release, $2,000 in

21   restitution and a mandatory $100 special assessment.

22       The government has discussed sentencing disparities in

23   other cases involving the same charge that Mr. Cortez pleaded

24   guilty to, which is 18 U.S.C. § 231(a)(3).  The most important

25   case, I think, in terms of sentencing disparities is

1      Mr. Larocca's case, who was sentenced to 60 days'

2      incarceration by this Court earlier this month.

3          And all due respect to probation and Mr. Ahmed, if this

4      court were to accept their recommendations, I believe that

5      would create an unwarranted sentencing disparity with

6      Mr. Larocca's case, if not the other 18 U.S.C. 231 cases.

7          And with that, unless the Court has any additional

8      questions, I will conclude.

9          THE COURT:  Thank you, Ms. Fifield.  As you have in the

10     other case, your presentation was very thorough, remarkably

11     restrained considering the subject matter, and I appreciate

12     it, as well as your full-time attention to these cases.

13         We have had close to 900 of these cases brought in this

14     little court.  Our dockets are full.  And if they weren't full

15     enough with the COVID backlog, they are full of these cases.

16     And we try, every single one of my colleagues and I'm sure the

17     U.S. Attorney's Office and defense counsel all try to treat

18     each case individually despite the mass crime that occurred,

19     and on its own merits, and I appreciate the attention and the

20     specificity with which you address Mr. Cortez's situation.

21         Mr. Ahmed?

22         MR. AHMED:  Thank you, Your Honor.

23     Good afternoon, Your Honor.

24         THE COURT:  Good afternoon.

25         MR. AHMED:  Your Honor, I appreciate the chance to

1    address the Court, to call the witness, and play some videos.

2    I just want to be mindful of the Court's time.  I'm not used

3    to being permitted to present.

4         THE COURT:  Maybe I need to reconsider the leeway I

5    give to people, but sentencing is tough.  It's really hard for

6    everybody.  It is the hardest part of my job.  So when we're

7    looking at a deprivation of one's liberty I tend to give a lot

8    of leeway.  But I assume you won't be going any longer than

9    Ms. Fifield's presentation?

10        MR. AHMED:  No.  I think --

11        THE COURT:  Okay.  Just give me one second because I

12   don't have my email up here, and I just need to alert someone

13   that I'm going to be running a little behind.  Excuse me.

14      (Pause.)

15      Okay.  Go ahead.

16        MR. AHMED:  Your Honor, I think it's appropriate to

17   start with a witness.  If the Court would permit, I'll call

18   Angela McClanahan, Mr. Cortez's mother.

19        THE COURT:  Ma'am, would you come on up and state your

20   name for the record, please.

21        MS. MCCLANAHAN:  My name is Angela McClanahan.

22   I'm Christian Cortez's mother.

23        THE COURT:  Good afternoon.

24      You may proceed.

25        MR. AHMED:  Your Honor, should I ask her questions or

1    allow her to make a statement?

2             THE COURT:  Whatever will be most expeditious.  It's

3    not a witness examination, so if you just want to speak for a

4    few minutes, that's fine, Ms. McClanahan.  I have read your

5    letter also.

6             MS. MCCLANAHAN:  Okay.  You know, I know you asked why.

7    I don't know why.  I wished I did.

8        First and foremost, I would like to thank the officers that

9    day.  Like you, I can't imagine what they felt and what they

10   were going through.  What I can tell you is, she's right, it

11   doesn't go toward the character of my son, who has always done

12   walks of life to help fight cancer and raising money to find

13   cures for cancer.

14       It doesn't go to show the type of person he is when the

15   house exploded behind us, he was the first one running in to

16   help save the man who got blown into the pool.  It doesn't

17   show that he got with a mom whose child that was his age

18   passed away from cancer, and him and all his friends for the

19   next four years kept that bond with her and raised money in

20   his memory and went and visited her.

21       So I don't know why.  I wish I could answer it.  Nobody

22   wants to see that.  We're all proud of this country, and I get

23   that there's people that want to fight for it and they want

24   the amendments and the constitution and I praise that.  But I

25   also, I don't praise officers having to deal with what they

1    had to deal with.  I don't think it should be taking up your

2    time, and I apologize for that as well.

3        But it just doesn't go to show -- I don't know why, because

4    it's not his character.  It's not who he is.  It's not who

5    he's been his entire life.  And I just think that in a blip of

6    an indiscretion, he's going to carry it with him -- and should

7    he have consequences?  Absolutely.  That's something I've

8    always taught him was to, you know -- whatever you do, you're

9    going to have to deal with the consequences of your actions.

10       So I know the judge will make the right decision, and I

11   appreciate the government and his attorney as well.  So I just

12   appreciate and wanted to give you a look into his actual

13   character long-term, not just that 15, 20 minutes of insanity

14   that was going on.

15           THE COURT:  Thank you, Ms. McClanahan.  It's been very

16   helpful, and I appreciate it.  People are complex.

17           MS. MCCLANAHAN:  Yeah.

18           THE COURT:  Thank you.

19           MS. MCCLANAHAN:  Yes, ma'am.  Thank you.

20           THE COURT:  Mr. Ahmed.

21           MR. AHMED:  Your Honor, I've met with Mr. Cortez many

22   times in my office.  I've asked him the question the

23   government is asking many times, every step of this.  What I

24   presented to the Court is to try to have the Court look at why

25   he went there.

1      He went there with the intention to make his voice heard.

2      He did not go there with the intention to agitate, to destroy,

3      or to harm.  And his actions that day, if the Court would

4      analyze the evidence, support that intention.

5                THE COURT:  Really, Mr. Ahmed?

6                MR. AHMED:  If the Court would permit, I can present

7      some of --

8                THE COURT:  I'm not going to interrupt you.  Go on.

9                MR. AHMED:  Yes, Your Honor.  If I could ask the

10     government to play the same video that we saw previously,

11     I'm just going to highlight a few moments of it.

12               THE COURT:  Okay.

13               MR. AHMED:  Yes, Your Honor.

14          Actually, Judge, is there a -- can I access the ELMO?

15               THE COURT:  Yes.  I can't tell you how.  But you can.

16               MR. AHMED:  Your Honor, I just wanted to start briefly

17     with how Mr. Cortez entered into the Capitol.  And that was

18     presented in Defense Exhibit No. 2.  I submitted the timeline.

19     I agree, Judge, it was longer than necessary, but there was a

20     purpose.

21          I think one of the several factors regard how the person

22     entered -- I think one of the factors that the government

23     mentioned as a factor for sentencing is how the defendant

24     entered into the Capitol.  And so when Mr. Cortez entered

25     into -- through the Parliamentarian Door, the Capitol had

1    been breached for well over 30 minutes.  So Mr. Cortez was

2    not part of that initial breach.

3        This image that's on the screen there is the door at

4    the moment that it was breached, and you can see there that

5    there's a handful of officers.  But soon after that -- this

6    next image is the crowd that was exiting.  These are

7    individuals exiting through the door that Mr. Cortez later

8    enters through.

9            THE COURT:  They're being forced to exit.

10            MR. AHMED:  Yes, Your Honor.  I'm not disputing that

11    he had permission to enter.  But just trying to give the Court

12    a perspective of what Mr. Cortez saw with his eyes.  So, as

13    he's walking in through these doors, there isn't a police line

14    that he breaks through in that moment.  He's entering through

15    a door where there's lots of people.

16        And the next image, Judge, the last one I'm showing on this

17    situation, is the moment of his entry.  There are officers

18    there.  I understand that he did not have permission, I'm not

19    arguing that point in any way, Judge.  They're not forming a

20    line.  He's entering without any direct resistance from

21    officers.

22        He remained inside for about 13 minutes.  The government

23    went through how he was led out under threat of arrest, and

24    that is correct.  To the extent that Mr. Cortez was following

25    officers' commands, up until that point he was not directly

defying an officer asking him to leave a certain area.

When he exited and he stood, remained outside the north doors, he didn't stay there the whole time, Your Honor. And we're able to establish that through some of the closed-circuit camera that's in the ramp that's right down the side of the north doors, and I submitted that as Defense Exhibit No. 8.

As I'm showing Defense Exhibit No. 8A, it's a little bit of a blurry camera, but it shows Mr. Cortez -- and the time stamps are actually there.  This is about 3:57 p.m.  It's when he walked down away from the north doors.  And he remained there for about six minutes.  So there's activity occurring by the north doors that he's not witnessing.

The next image, Exhibit 8B, is -- this is after he was sprayed and after he threw down the flag.  So after this point, so the time stamp here is 4:16 p.m., he does not return to the north doors.  He stays in that area for some time.  And there's another image of him at 4:23.

And then at 4:37 is the moment when he leaves.  And you can see he's leaving.  He's standing ahead of his codefendant. Mr. Larocca did re-approach the north doors, at least walked up that ramp after Mr. Cortez had been sprayed.  But Mr. Cortez did make a decision not to re-approach those north doors after he was sprayed and threw down the flag.  He kind of gave up hope in the protest at that point.

1        I'd like to play Exhibit No. 5.  So this, Your Honor, is

2   Exhibit No. 6.

3        (Video played.)

4        MR. AHMED:  Exhibit No. 6, I can't put a time stamp on

5   it because it's open source.  But it appears to be before the

6   approach to the north doors.  Mr. Cortez is clearly in the

7   front of this crowd.  What is he doing there?  What is he

8   trying to do?  He's not yelling at the officers.  He's yelling

9   at the crowd.  He's pointing at them.

10       THE COURT:  The crowd didn't take an oath.  When he's

11  yelling "remember your oath," he's not talking to the crowd,

12  is he?  Are you saying that's who he was talking to?  Because

13  the only people who took oaths there were law enforcement.

14       MR. AHMED:  Yes, Your Honor.  I'm not sure if he is --

15  I couldn't hear what he said in this particular video, but --

16       THE COURT:  Are you saying the person who's yelling

17  "remember your oath," are you saying that's not your client?

18       MR. AHMED:  In this video?

19       THE COURT:  Yes.

20       MR. AHMED:  I'm not sure, Judge.  If you want me to

21  replay it --

22       THE COURT:  No, that's fine.

23       MR. AHMED:  What I can see and what Mr. Cortez has

24  explained to me is that what he's doing here is he's trying to

25  maintain this mob.  He's trying to block -- his hand's going

1       up, trying to block an item that's being thrown from the

2       crowd towards the officers and he's pointing at them.

3           (Video continues.)

4           MR. AHMED:  To answer the Court's question, it sounds

5       like that's not him.

6           THE COURT:  Yeah, I don't know.  I'm not going to

7       concede it's him and it's not going to factor into my

8       decision.

9           MR. AHMED:  Okay.  I'm going to move on to Exhibit

10      No. 5.  I'm not going to play this all because the government

11      played much of it.  I'm going to focus on just a few moments.

12      So at 6:24.

13          (Video played.)

14          MR. AHMED:  So in part of this image, Judge, is a

15      person who's trying to use the bike rack, it's being used as

16      a battering ram to try to open the doors.  What you can see

17      there is there's another person, another protester, not law

18      enforcement officer, who appears to be trying to stop this

19      person from using the bike rack.  And there's a conflict there

20      among the protesters.  He seems to threaten the other

21      protester who's trying to stop him from damaging the property.

22      So this is kind of the circumstances that Mr. Cortez was

23      dealing with, this unruly crowd.

24          I'm moving on to 11 --

25          (Video continues.)

1          MR. AHMED:  So that's about 11:27.  I'm stopping it.

2     And you can see Mr. Larocca right behind Mr. Cortez.  When I

3     asked Mr. Cortez what's he doing there in the front of this

4     crowd, his justification, Judge, is yes, he's there to

5     protest, but he also doesn't want this to get out of hand.

6     He's trying to maintain a position, he's putting his physical

7     body between the front line of the officers and other

8     individuals.  You look at the individual standing right next

9     to him, he's wearing body armor and goggles.

10          (Video played.)

11          MR. AHMED:  And so he sees himself as a peacemaker

12     in this protest.  His intent is not there that I'm going to

13     lead an agitation and a destruction and an attack on officers.

14     That's his perspective, Judge.  And the video that we played

15     earlier with him trying to block the item I think supports

16     that.

17        This second part is 12:07, or 12:06, which is after the

18     officers sort of retreat and Mr. Cortez and the crowd move

19     closer to the doors.

20          (Video continues.)

21          MR. AHMED:  And so in about three seconds or so, the

22     Court will see that someone's trying to damage the front door

23     right in the area where Mr. Cortez is.

24          (Video continues.)

25          MR. AHMED:  There it is.  At about 12:03 you can see

someone hit the door.  What Mr. Cortez explains is that's
somebody using a skateboard trying to break the windows.
Mr. Cortez tries to block that person with his hand and the
person gets upset at him.

Mr. Cortez leaves this area.  And we can see later, at
about 15 minutes into this video is when the government was --
you can see people throwing rocks and using a bike rack and
Mr. Cortez is not in the direct vicinity of these north doors
at this point.

(Video continues.)

MR. AHMED:  And just moving forward to about 15:50.

(Video continues.)

MR. AHMED:  So these are scenes where people are trying
to breach the door and Mr. Cortez is not there.

The final video part that I'm going to play here, Judge,
is at about 20 minutes, and I'm going to conclude this video.
It is when Mr. Cortez starts yelling at the officers.

(Video continues.)

MR. AHMED:  And I pause it there to see that the
officers were spraying pepper spray to deter the crowd, and
it's right at that moment that Mr. Cortez is hit directly in
his eye by that stream of pepper spray.  So it was this moment
of anger that really set him off and caused him to yell, throw
down his flag and leave there.

That's all the video that I wanted to play.

1        THE COURT:  Thank you.

2        MR. AHMED:  Just some more brief argument.

3     Your Honor, Mr. Cortez was appropriately prosecuted.

4   He is facing consequences for his actions.  We tried to get

5   him a misdemeanor, that wasn't an option in this case.  A lot

6   of people in these cases have misdemeanors.  Mr. Cortez is not

7   among them.  A felony conviction in the eyes of the general

8   public is a deterrent, and for Mr. Cortez it is a deterrent.

9   He understands this was not an easy step.  He can't vote.

10  The Court has a heavy responsibility.  There are a lot of

11  concerns that goes beyond Mr. Cortez.

12    With respect to disparity, I would respectfully ask the Court

13  to consider some of the sentences that have been imposed on this

14  type of charge.  One of them is for Daniel Johnson.  He received

15  a four-month sentence.  He stands apart from Mr. Cortez.

16    Mr. Johnson was part of the true initial breach of the

17  Capitol.  He snuck in through a broken window by the Senate

18  side, broke through a police line from inside the Capitol,

19  went to the Rotunda doors and opened them up, helped open them

20  up from the inside.  And he stayed inside for about 23 minutes.

21  He in fact left the building before Mr. Cortez ever entered.

22  That was Daniel Johnson.

23    The second person is Derrick Evans.  He's a state legislator.

24  He was wearing a helmet.  He was actively encouraging other

25  people to assault law enforcement officers.

1        Mr. Cortez, Your Honor, did take a position at the front of

2    this protest.  He did make statements like "hold your position."

3    I would ask the Court to consider whether that's the same as

4    encouraging others to attack the officers.  He still had hope

5    in the protest at those points.

6        I will conclude, Judge, on this note:  I've made a point

7    about mercy being a stronger deterrent than incarceration, and

8    I truly believe that.  I was just reflecting to Mr. Cortez that

9    I would hope that one day he and other people who were in the

10   Capitol would be invited back to actually sit down and be heard

11   and be listened to by the legislator.

12       But that's beyond the scope of what we're punishing here.

13   But that moment of listening and trying to understand the

14   person, I was -- you know, I was a privilege to sit down with

15   him and really get to hear him out and not to make assumptions

16   about his character and his purpose.

17       His medical issues, Judge, we talked about them.  When he

18   was a young man he was told you're not going to live past 18.

19   Finally they diagnosed him.  He has this incurable condition.

20   It's a condition of like muscular atrophy.  There's still a

21   prognosis that's uncertain.

22       He's not told that you have a certain number of years to

23   live, but he knows that at some point his muscles will

24   deteriorate, he will be in a wheelchair.  There are certain

25   foods he can't eat.  Too much exercise or too much standing

1    affects him, his muscles.  So he had a carpentry job that he

2    had to stop.

3        That medical issue, I'm not raising it to say that he can't

4    go to jail because of it.  The reason I raise that, Judge, is

5    to give the Court some understanding of what's going on in his

6    mind.  He's being told, you don't have much longer to live.

7    He wants a purpose in his life and he's being told these things

8    by the president, you need to save your country, and he's trying

9    to do something right, he's trying to do something positive.

10   He's trying to contribute.

11       He's misguided.  But that's where his mind and his heart

12   are, and I would ask the Court to take that into consideration.

13   He's been on pretrial supervision for well over a year now.

14   His curfew conditions and his travel restrictions I think may

15   be more restrictive than his codefendant had, but he's been

16   fully compliant.  I don't think that more than one year of

17   supervised release is necessary for him.  I would ask the Court

18   to impose what was recommended by probation.  He's willing and

19   happy to do community service.

20           THE COURT:  Thank you, Mr. Ahmed.

21        Mr. Cortez, I read the letter that you sent me as well as

22   all the other letters and materials I got.  But I told you at

23   your plea that you would have a right to speak and address the

24   Court at your sentencing and that you don't have to.  And that

25   if you don't want to speak, I won't hold it against you or

1    punish you in any way.  But if you do want to speak, you

2    certainly have a right to.  So, would you like to speak at

3    this point?  If you do, you can come on up.

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Good afternoon.

6              THE DEFENDANT:  Good afternoon.  So I would like to

7    start that I don't believe anything that happened on January 6

8    involving the Capitol was productive in any means.  I believe

9    it was only destructive.  And I personally only have the most

10   respect for the law and the rule of law.

11      I personally felt like I was obligated to attend the

12   protest and in no way did I feel like I had any comprehension

13   on how it was going to play out.  I just thought I was going

14   to D.C.  I believe this place is a beautiful area and it's

15   baffling what our founding fathers created a swamp into

16   something that it is now.  And I love my country.

17             THE COURT:  You know, that's actually a myth.

18   We weren't a swamp.

19             THE DEFENDANT:  Really?

20             THE COURT:  It is very hot and very humid, but it

21   was not a swamp.

22             THE DEFENDANT:  Even to begin with?

23             THE COURT:  No.  Apparently, like Foggy Bottom, that

24   area is because of gas works.  I think this area is built near

25   a river and near certain marshlands.  But contrary to --

1       THE DEFENDANT:  Just foggy?

2       THE COURT:  Feels like it.

3       THE DEFENDANT:  Yeah.  Historical -- history likes to

4   make it more prettier than it is.

5       THE COURT:  Yes.

6       THE DEFENDANT:  But I do love D.C., even with new

7   revelations.  But I do believe I need to take responsibility

8   for what happened at that point.  All I did was interfere in

9   officers who were unmanned and they needed so much more that

10  was going on at the time than what they had, and I do feel

11  like I should take responsibility for the actions of me being

12  there.  I shouldn't have been there, because like I said, I

13  was only there for a protest, and following others into a

14  place isn't justification for what transpired.  With that,

15  that's it, Your Honor.

16      THE COURT:  Thank you, Mr. Cortez.

17      THE DEFENDANT:  Yes, Your Honor.

18      THE COURT:  And for your letter.

19      All right.  Now it's my turn.  I'll try not to take too

20  long.  I have to consider in every case the relevant factors

21  set out by Congress in 18 U.S.C. § 3553(a) and ensure that I

22  impose a sentence sufficient but not greater than necessary to

23  comply with the purposes of sentencing.  Purposes include the

24  need for the sentence to reflect the seriousness of the

25  offense, to promote respect for the law, provide for just

1    punishment, to deter criminal conduct, protect the public from

2    future crimes and promote rehabilitation.

3        I must consider the nature and circumstances of the

4    offense, Mr. Cortez's history and characteristics, the types

5    of sentences available, the need to avoid disparity and the

6    need to provide restitution.  I've considered all of these

7    factors.  I'll discuss some of them now.

8        With regard to the -- well, the nature of the offense.

9    I think I said this to Ms. Fifield.  I watch these videos

10   and look at these photographs and listen to the audio in

11   every single case.  And I am never -- I am struck every time.

12   I haven't gotten numb to it.  I am struck every single time

13   at the horror of it, at how frightening it was.  And it is --

14   just watching it for me and sitting in my chambers watching

15   these videos, it is -- I can't imagine how Officer Green and

16   his colleagues must have felt that day.

17       There have been officers -- I had an officer in here,

18   Officer Gonell, testifying about slipping in people's blood

19   and wondering if they were going to get home alive.  Officer

20   Gonell sustained permanent injury.  Can't raise his right arm

21   above his head.  He's probably going to have to retire at a

22   very young age from a job that he loves.

23       You forget that law enforcement officers don't have a

24   choice.  They run to places we run from.  They have to stay

25   no matter the circumstances and try and protect the people

1    they're sworn to protect.  In this case the members of

2    Congress and their staff and the vice president who were

3    inside that building trying to perform their jobs, which was

4    to effect the peaceful transition of power that had followed

5    a lawfully conducted election.

6        I don't care what your political beliefs were.  I don't

7    care what your political beliefs are.  I've said it on

8    numerous occasions in this courtroom.  This is one of the

9    great things about this country, in addition to -- there's a

10   number of amendments, but there's a First Amendment.

11       You can believe what you want to believe.  You can believe

12   in the Flying Spaghetti Monster, and you can protest in a

13   lawful way and say the most vile and outlandish things that

14   you want to.  What you cannot do is break the law.  And I

15   know Mr. Ahmed said you came here because you wanted to

16   protest and you answered a call.

17       I'd first point out this is not the first contested

18   election in my history.  We had one that was decided

19   ultimately by the Supreme Court.  There was no violence.

20   People went about their business because in the history of

21   this country, that's what happens.  There's an election,

22   there's a transfer of power, and if your guy loses, you move

23   on.  You run again.  You protest if you want.  But this is a

24   first.

25       And I have heard defendants say that they came to protest,

1     and maybe you came to attend the rally.  Fine.  But at

2     some point, when you leave the rally and you go towards the

3     Capitol -- and, Mr. Ahmed, I noticed in your memo you said

4     the purpose of the rally was well articulated and patently

5     reasonable, and then that your client marched to the Capitol

6     building to peacefully protest and save our country, and

7     politics and deceit aside, the purpose of this trip was

8     honorable.

9         Well, maybe there were some people who marched to the

10    Capitol to protest.  But I will tell you that many of the

11    people marching to that Capitol from the Ellipse wore body

12    armor, helmets, flak jackets, they carried signs.  They were

13    chanting things that had nothing to do with protest.  And when

14    Mr. Cortez got to the Capitol, he could not have helped but

15    see the mayhem and the chaos that was going on around him.

16        So he made several choices that day having nothing to do

17    with peaceful protest.  He could not have -- it could not have

18    escaped his notice that there were people scaling the walls,

19    that there were windows being broken.  There were bike racks

20    being used, that sirens were going off.  It was a scene of

21    incredible chaos and disorder and violence.

22        So he could have seen that and decided, no, this is not

23    what I want.  I don't want to be a part of that.  This is not

24    a protest.  I'm leaving.  People did.

25        He decided to go on in, with his flag, with his

1   codefendant, with people who were throwing projectiles and

2   breaking windows and engaging in officers and assaulting

3   officers.  So, at that point, this is not a peaceful protest.

4   This is a mob attack at the very foundation of our democracy.

5   And it's an attempt, and I don't believe this is hyperbole,

6   to overthrow the government.

7       People are complicated.  They act in complicated ways.

8   And Mr. Cortez was not just a participant in that attack; he

9   was an agitator and a leader.  I know you talk about times

10  when -- your argument is he's attempting to quell the crowd or

11  attempting to block a projectile, but the full story of your

12  client's activities, of Mr. Cortez's activities show him

13  screaming, yelling, entering when he knows he's not supposed to

14  go in there, engaging with the police, being sprayed and yet not

15  backing off, and by his very presence and actions encouraging a

16  violent mob.  And I've said it before, a mob isn't a mob without

17  the people.

18      So this was not a protest gone wrong.  Well, it was a protest

19  gone wrong, but it went wrong a lot earlier and Mr. Cortez knew

20  what he was doing when he went towards that Capitol and

21  ultimately went inside.  He knew he wasn't supposed to be there.

22  He couldn't have missed all the violence and the disorder going

23  on around him.

24      Mr. Cortez's -- he may not have been throwing the projectiles

25  and maybe he tried to block one -- I don't know that I agree

with that interpretation -- but he certainly was there when people were doing that.  He screamed and cursed at the police, accused them of breaking their oath, which is pretty ironic when you consider that they were keeping their oath that day.

His aggression threatened officer safety and directed the officers' attention from other -- from their intended task of protecting the people inside that Capitol.  He's yelling to hold our positions?  That's not a peaceful protest.  That's an attack strategy.  And he led them in an attack that almost succeeded in preventing the north doors from being secured.

"I will fight for your freedom until I die, I swear it." There was no remorse immediately after.  There was no sudden awakening of, oh, my gosh, what did I do?  What have I done? This is not what I came here to do.  Mr. Cortez's response in the aftermath of his activities is one of triumph, not remorse.

Turning to Mr. Cortez's characteristics as an offender, Ms. Fifield asked the question that people often ask in criminal cases, which is "why."  I was a public defender for a long time.  I've been a judge not quite as long.  And the answer to that question is often unknowable.  What I will say is that people act in ways that are not consistent with their character all the time, not just in these cases.

I have defendants in front of me for horrible crimes. I represented defendants for murders and robberies and horrible violent behavior, and I have people in front of me for drugs and

1    guns.  And they're loved.  They're somebody's child.  They

2    have people come into my courtroom and talk about how helpful

3    they are and what good sons they are and good brothers they

4    are.  People are complex.  They do bad things, even though

5    they may be in other respects good people.

6        And I think Mr. Cortez is an example of that.  He's clearly

7    loved in his community.  He's clearly loved by his family.

8    He's clearly not -- he's an active participant in trying to make

9    his community better.  I don't dispute that for a second, that

10   this event represents an aberration in his character.  But he

11   did it.  And I will tell you that -- the reason why people act

12   -- certainly he was motivated to come because his candidate

13   didn't win and he somehow believed this election was stolen and

14   he wanted to get it back.

15       As I said, this wasn't just a protest.  He wanted to -- that

16   mob wanted to overthrow the government.  They wanted to undo

17   the results of what they considered a stolen election; their

18   guy didn't win.  I don't know.

19       But, yes, he did act out of character and I do take that

20   into consideration.  But I have a lot of people in these cases

21   and in other cases who acted out of character.  And one of

22   the key things to consider is there was a mob, and people

23   do things when they're in large groups, especially emotional,

24   overwrought, angry groups, that they would never do on their

25   own.

1   Mr. Cortez would probably never have gone up to the
2   Capitol by himself and tried to break things and scream at
3   police officers, for the simple reason he would have been
4   arrested immediately.  But that would have seemed crazy,
5   perhaps.  But you're with a group of people, and they're
6   all acting crazy and you get caught up.
7   But he chose to do it.  Lots of people left that rally
8   and didn't go there.  Lots of people saw what was going on
9   and left and lots of people agree with Mr. Cortez about the
10   election and didn't come here and try and take over the Capitol.
11   So, the why?  I don't know.  That's really not for me to
12   decide or find out in order to sentence Mr. Cortez.
13   I realize he has a medical condition that has put a cloud
14   over his future.  His medical condition did not stop him from
15   coming to the Capitol and engaging in very, very, very risky
16   physical behavior, I would note.
17   With regard to the types of sentences available, I have
18   five years here.  I could give Mr. Cortez five years in prison.
19   I'm not going to.  I think a term of supervised release is
20   warranted.
21   But I'm also, in terms of disparity, mindful of the fact that
22   I gave his codefendant, Mr. Larocca, 60 days.  And even though
23   these cases are unusual, I do consider -- I look over -- every
24   time I have a sentencing I have a chart, and I look to see not
25   just what other judges are doing but what I've done, because I

take these cases very seriously and I consider each defendant.
I haven't decided that everybody's going to jail or everybody --
no.  I look at each case on its own and each defendant on their
own merits.  But I have to consider that the sentence should be
in proportion to what other sentences I've given.

And there are other judges who have taken a different view
with regard to the severity of sentences that are warranted,
and that's their right.  But I try to be internally consistent
as well as consider what other judges are doing.

In *Dennis Sidorski*, Judge Jackson imposed a hundred-day
term of incarceration for conduct comparable to Mr. Cortez's.
In *Bromley*, Mr. Bromley got 90 days of incarceration.
I sentenced Mr. Romero, sort of similar conduct but more
aggressive, I gave him 12 months and a day.  And I gave
Mr. Larocca 60 days.

Here's the thing:  Deterrence weighs heavily on my mind.
Just punishment is important, but you don't want punishment
to be retribution.  Punishment has to be proportional.  But
deterrence is an extremely important aspect here, not just
for Mr. Larocca, not just for Mr. Cortez individually, because
I want Mr. Cortez to understand that he can never, ever do
something like this again.

But it's also general deterrence.  Because to the extent
that anybody comes in this courtroom and says this cannot
happen again, they're dreaming.  I know the government knows

1    this.  The threats, the level of rhetoric out there, the level

2    of communications that we're getting as judges and our staff

3    because of these cases and other people involved in these cases

4    are getting, it absolutely could happen again, and it has to be

5    made crystal clear to anyone who considers doing such a thing

6    again that the consequences are going to be certain and severe.

7    You're not going to be sitting at home watching TV.  They're

8    going to be consequential.

9        Therefore, based on my consideration of all of the 3553(a)

10   factors, I'll now state the sentence to be imposed.  Could you

11   stand, Mr. Cortez, with your lawyer.

12       (Defendant complies.)

13       It is the judgment of the Court that you, Christian Cortez,

14   are hereby committed to the custody of the Bureau of Prisons

15   for a term of four months of imprisonment for civil disorder

16   in violation of 18 U.S.C. § 231(a)(3).

17       You are further sentenced to serve three years, that is

18   36 months, of supervised release.  You're required to pay

19   $2,000 in restitution as you agreed to in your plea agreement.

20   You are ordered to complete 60 hours of community service.

21       I decline to impose a fine in this case, and you must pay

22   a $100 special assessment to the clerk of the U.S. District

23   Court for the District of Columbia, who shall forward the

24   payment to the Architect of the Capitol.  That is in addition

25   to the $100 special assessment, the $2,000 restitution that

1  you agreed to pay.  Within 30 days of any change of address,

2  you shall notify the Clerk of the Court of the change until

3  such time as the financial obligation is paid in full.

4      Mr. Ahmed, do you have any recommendation for Mr. Cortez's

5  facility?  Any request for a recommendation?

6          MR. AHMED:  Yes, Your Honor.  We'd ask the Court to

7  recommend a local facility near Houston, Texas.

8          THE COURT:  All right.  I will recommend that

9  Mr. Cortez serve his sentence in a facility closest to

10  Houston, Texas.  Mr. Cortez, I don't have any authority over

11  the Bureau of Prisons, none.  But I can make recommendation

12  and hope that they will follow that recommendation to the

13  extent that they can.

14      Within 72 hours of release from custody, you shall report

15  in person to the probation office in the district to which

16  you're released.  While on supervision you'll submit to DNA

17  collection.

18      You shall not possess a firearm or other dangerous weapon.

19  You shall not use or possess illegal controlled substances and

20  you shall not commit another federal, state, or local crime.

21  You shall also abide by the general conditions of supervision

22  adopted by the U.S. Probation Office as well as the following

23  condition:

24      You must complete 60 hours of community service, which

25  will benefit not only the community, but also you, as you will

1    acquire some additional experience and broaden your community

2    of associates.  Probation office will supervise the participation

3    in the program by approving the program, and you must provide

4    written verification of completed hours to the probation

5    officer.  This does not include any online program.  I had

6    that happen.

7        Probation office shall release the presentence investigation

8    report to all appropriate agencies in order to execute the

9    sentence of the Court.

10       Mr. Cortez, I told you when you first came before me that

11   compliance with your conditions of release would be important

12   for you, and I told you that again at your plea when I allowed

13   you to remain on release pending sentencing, and I'm telling

14   you again today, because you have complied with your conditions

15   of release, I'm going to allow you to self-surrender to serve

16   your sentence.  I assume there's no objection, Ms. Fifield?

17           MS. FIFIELD:  No objection.

18           THE COURT:  All right.  You may self-surrender to

19   the Bureau of Prisons at a time to be arranged by your lawyer,

20   the probation office and Bureau of Prisons.  While on release

21   you're required to continue to follow your conditions of

22   release and if you violate any of these conditions while on

23   release, you could be detained for failing to comply and you

24   may be charged with contempt of court.  Obviously, if you do

25   not show up for your self-surrender date, you could be charged

1    with another criminal offense, the penalty of which would be

2    consecutive to any penalty you serve in this case.

3        Pursuant to 18 U.S.C. § 3742 you have a right to appeal

4    the sentence that I impose, subject to certain rights of

5    appeal that you waived as part of your plea agreement.  If you

6    choose to appeal you must file an appeal within 14 days after

7    I enter judgment.  And if you are unable to afford the cost of

8    an appeal you may request permission from the Court to file an

9    appeal without cost to you.

10       As set forth in the plea agreement, the government pledged

11   to dismiss the remaining counts in the indictment against

12   Mr. Cortez.  Ms. Fifield, does the government wish to do so

13   now?

14           MS. FIFIELD:  Yes, Your Honor.  As Mr. Cortez pleaded

15   guilty to a superseding information, the government would move

16   to dismiss the indictment against Mr. Cortez.

17           THE COURT:  The motion is granted.  The remaining

18   counts will be dismissed.

19       Mr. Cortez, your lawyer alluded to in his sentencing

20   material someone for whom I have great admiration; that's

21   Bryan Stevenson.  I often say this to defendants, and I will

22   say it to you here.  You're a young person.  You have your

23   whole life ahead of you, and I know that you're going to use

24   this to move ahead.

25       And what Mr. Stevenson said is that you are not the worst

thing you've ever done.  You're more than that.  And one of
the ways that you show what you're made of is not the fact
that you made a mistake, but what you do after you make the
mistake, the life you lead, how you pick yourself up and what
you do with your life after the mistake.  And that is a true
test of your character.

I want you to look at Officer Green, because Officer
Green is one of the number of law enforcement officers you
confronted that day, and understand the people, not just
the law enforcement officers, but the people in that building,
the people in this city, we are public servants.  People call
it a swamp, and maybe one of the reasons you were able to do
what you did on that day was because you don't view the people
who work in that building as patriots.

But Officer Green and his colleagues, the people who were
working in that building that day, the people who have worked
since to prosecute these cases and investigate these cases,
they're patriots.  They love their country every bit as much
as you do.  And understand that your participation caused a
lot of harm that will continue to reverberate for a long time
in this country.

I want, and I hope, that you do your best to make up for
that.  Good luck to you, sir.

Oh, Probation has something to say.  Yes, Ms. Landon.

PROBATION OFFICER:  Your Honor, if I may.

1          I would just ask that the Court entertain transferring

2     supervision and jurisdiction to the Southern District of

3     Texas, and that would advise the defendant and counsel -- I'll

4     meet with them, or the probation office will meet with them

5     after today's hearing to discuss voluntary surrender and

6     paperwork.

7          THE COURT:  Thank you, Ms. Landon.  Anyone have any

8     objection to transferring supervision of Mr. Cortez's case to

9     his home district?

10          MS. FIFIELD:  No objection.

11          MR. AHMED:  No objection, Your Honor.

12          THE COURT:  I will order that.  And jurisdiction, yes.

13       All right.  Good luck to you, Mr. Cortez.

14          MR. AHMED:  Your Honor, there was one clarification.

15     Regarding the facility, Mr. Cortez is requesting FCI Bastrop,

16     which is in Swift, Texas.

17          THE COURT:  I'll make that recommendation.  Make sure

18     Mr. Bradley has the name.

19          MR. AHMED:  Thank you.

20          THE COURT:  All right.  Thank you, everyone.

21          (Proceedings adjourned at 2:14 p.m.)

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne